UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:

                                  Case No. 16-42973-nhl

Rohit Masih,

                                  Chapter 7

                        Debtor.
-------------------------------------------------------------x
Itria Ventures LLC,

                        Plaintiff                Adv. Pro. No. 16-01145-nhl

           v.

Rohit Masih,

                        Defendant.
-------------------------------------------------------------x


## DECISION AND ORDER AFTER TRIAL

APPEARANCES:


Edward Weissman, Esq.                 Robert Musso, Esq.
Jan Marcantonio, Esq.               Rosenberg Musso & Weiner LLP
Law Office of Edward Weissman    26 Court Street, Suite 2211
60 East 42nd Street, Suite 557      Brooklyn, NY 11242
New York, NY 10165               *Attorneys for the Defendant*
*Attorneys for the Plaintiff*

NANCY HERSHEY LORD
UNITED STATES BANKRUPTCY JUDGE

Before the Court is an adversary proceeding commenced by plaintiff Itria Ventures LLC ("Itria" or "Plaintiff") objecting to the discharge of the debtor and defendant herein, Rohit Masih (the "Debtor" or "Defendant") pursuant to 11 U.S.C. § 727(a)(3) and (a)(4).[1]

The Court held a trial on the matter, at which counsel for Plaintiff and counsel for the Debtor appeared and were heard, and testimony was taken. *See* Trial Tr., ECF No. 20.  The parties submitted post-trial briefs in lieu of closing arguments, and the matter was subsequently taken under advisement. *See* ECF Nos. 22–23.

For the reasons set forth below, the Court finds that Itria has failed to meet its burden to establish by a preponderance of the evidence that the Debtor's discharge should be denied pursuant to 11 U.S.C. § 727(a)(3) and (a)(4).

## JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(1), and the Standing Orders of Reference in effect in the Eastern District of New York dated August 28, 1986, and as amended on December 5, 2012, but made effective *nunc pro tunc* as of June 23, 2011.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J).  This decision constitutes the Court's findings of fact and conclusions of law to the extent required pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND

*Relevant Procedural History*

On July 1, 2016, the Debtor filed a voluntary chapter 7 petition under the Bankruptcy Code, by his then-counsel of record, Hector M. Roman. Pet., ECF No. 1, Case No. 16-42973-nhl (the

---

[1] Unless otherwise indicated, all statutory references are to 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").

"Main Case").[2]  On his Petition, the Debtor listed his residence as being 94-36 114th Street, South

Richmond Hill, NY 11419. *Id.*  For Question 6 of the Petition, the Debtor checked the box that

states: "Over the last 180 days before filing this petition, I have lived in this district longer than in

any other district." *Id.*  On July 11, 2016, the Debtor filed his required chapter 7 schedules and

documents. ECF Nos. 7–9, 11, Main Case.  In Schedule A/B, the Debtor listed his 100% ownership

interest in "Masih Gas Inc." Sch. A/B, ECF No. 7, Main Case.  The Debtor also listed in Schedule

A/B, a checking account ending in 7200 at Chase Bank with a balance of $108.00. *Id.*  In Schedule

E/F, the Debtor listed a general unsecured claim owed to Itria in the amount of $250,929.93. Sch.

E/F, ECF No. 7, Main Case.  On September 30, 2016, the Chapter 7 Trustee, Richard J. McCord

filed a docket entry in the Main Case entitled "Chapter 7 Trustee's Report of No Distribution."

On August 5, 2016, Itria commenced this adversary proceeding against the Debtor seeking

to deny his discharge by the filing of a Complaint, ECF No. 1, as amended on October 25, 2016

(the "Amended Complaint"), ECF No. 7.[3]  The Amended Complaint alleges that the Debtor

provided financial information and made representations to Itria that were "false, fraudulent, [and]

bogus," in order to induce Itria to "make advances to businesses owned, operated, and/or controlled

by the Debtor in the nature of combined gas stations/convenience stores." Am. Compl. ¶ 5.  Itria's

allegations of fraud by the Debtor as set forth in the Amended Complaint are as follows: (i) the

Debtor represented to Itria's principal that the subject businesses would be operated by someone

with experience, but were not; (ii) the Debtor deliberately misled Itria as to the businesses'

financial condition at the time he sought advances; (iii) the Debtor falsely represented that another

gas station would be acquired with the monies advanced by Itria; (iv) the Debtor defaulted on the

---

[2] Unless otherwise indicated, all references to "ECF No. __" are with respect to the docket of the adversary
proceeding, Adv. Pro. No. 16-01145-nhl.
[3] The Complaint only alleged claims under § 727(a)(3) and (a)(4); the Amended Complaint additionally alleged
claims under § 523(a)(2), (a)(4), and (a)(6).

$200,000 advanced by Itria within about a month after receiving the same, due to undisclosed problems; and (v) the Debtor, in bad faith, failed to disclose that he never paid his landlord or other vendor creditors. *See id.* ¶ 8.

On October 18, 2016, the Debtor filed an Answer, ECF Nos. 5–6, as amended on November 9, 2016 (the "Amended Answer") to the Amended Complaint, ECF No. 12, denying essential allegations and raising certain affirmative defenses.  On November 1, 2016, an Ex Parte Motion to Substitute Attorney Rosenberg Musso & Weiner, LLP for Attorney Law Office of Hector M. Roman, P.C., as counsel for the Defendant was filed. ECF Nos. 8, 10.

Counsel for both parties executed and filed a Notice of Proposed Stipulation dated November 4, 2016, striking references to § 523 in the Amended Complaint. ECF Nos. 9, 14.  On March 9, 2017, the Court entered an Order deeming all references to § 523 in the Amended Complaint stricken as untimely filed. ECF No. 15.

On November 21, 2016, the Court entered a Pre-Trial Scheduling Order, ECF No. 13, as amended by Order entered March 27, 2017, ECF No. 16.  On October 10, 2017, the parties filed a Joint Pre-Trial Memorandum. ECF No. 17.  The facts of this case were developed at trial through the testimony of two witnesses, Ramit Arora and the Debtor, and certain exhibits admitted into evidence.  Thereafter, the parties filed their respective post-trial briefs, ECF Nos. 22–23, and the matter was marked submitted.

*Facts*

Itria is a company that provides accounts receivable financing to small businesses. Trial Tr. 16:15–16.  Ramit Arora ("Arora") is the President of Itria, and is responsible for the day-to-day operations of the business and for the underwriting of potential financing to other businesses. *Id.* at 17:1–3.

The Debtor is a medical doctor and is the son of Mana Masih ("Mana") and Yasmin Masih ("Yasmin").  He was the President and sole shareholder of Masih Gas Incorporated ("Masih Gas"), a corporation that had been in the business of operating a gas station and convenience store located in New York. *Id.* at 17:12–15, 21, 106:7–9.  In January of 2015, the Debtor resided in Illinois, where he was working as a "doctor or doctor in training" for a company called RSA Medical located in Chicago, Illinois. *Id.* at 78:25, 79:1–3, 82:11–13, 161:4–6.  The Debtor testified that his role with respect to Masih Gas was to "over[see] [its] operations from time to time," and that when he would visit his home in Queens, New York, from out of state "every few months or every so often," his father, Mana—who was overseeing Masih Gas's day-to-day operations—"would describe to [him] how the business [was] going . . . and just kind of go over the profits, how much business the gas station [was] making and things like that." *Id.* at 117:21–25, 118:9–15.

In early January of 2015, Mana and Yasmin met with Arora, to request that Itria finance the receivables of Masih Gas so that a new gas station and convenience store could be acquired under the name Kandiara Gas, Inc. ("Kandiara Gas"). *Id.* at 18–19.  According to Arora, at that meeting, Mana and Yasmin represented to Itria that Masih Gas was "thriving," and because they had been successful in operating one gas station and convenience store, they sought to purchase another one. Trial Tr. 19–20.  Mana and Yasmin also represented to Itria that Masih Gas was current with payments to its landlord and vendors. *Id.* at 20:7–10.  Mana further represented to Itria that he would be operating the business on a day-to-day basis, and that the Debtor would be overseeing the business and making all business decisions jointly with Mana. *Id.* at 20–21, 69.

Following the meeting, Itria requested financial information from Masih Gas, specifically, its 2013 business tax returns, the bank statements from its business account maintained at Bank of America, and its credit card processing statements for the prior six-month period, which documents

were provided. *Id.* at 22.  Masih Gas also provided Itria with the name of its landlord, trade references, and information about its merchant processor and merchant processing account. Trial Tr. 26; Pl.'s Ex. A.

Arora testified at trial that the financial documents revealed that Masih Gas was thriving and that it had consistent cash flow and revenue, which was on an upward trend every month. Trial Tr. 31.  Itria contacted Masih Gas's landlord, its trade references, and gas supplier, and also checked the business and personal credit reports, which indicated that the business payables and personal obligations were being paid on time. *Id.* at 33.  Itria also conducted a site visit of the premises where Masih Gas was operating, which showed that the convenience store was full of inventory and that the gas station was busy and operational. *Id.*  Based upon the foregoing, Itria concluded that it would be appropriate to advance monies to Masih Gas and Kandiara Gas. *Id.* at 34.

On January 20, 2015, Itria entered into a future receivables sale agreement (the "Agreement") with Masih Gas and Kandiara Gas (the "Businesses"). *See* Pl.'s Ex. B.  The Debtor executed the Agreement on behalf of the Businesses as their "owner." *Id.*  The Debtor, Mana, and Yasmin,[4] each executed personal guaranties with respect to the Agreement. *Id.*

Pursuant to the Agreement, Itria advanced $200,000 to the Businesses, of which $65,000 was used to pay Masih Gas's existing obligations to OnDeck Capital directly, and the remaining funds in the amount of $135,000 were deposited into Masih Gas's business bank account at Bank of America (the "Masih Gas Bank Account"). *Id.*; Trial Tr. 37–38.  The Agreement did not permit the use of said funds for any personal expenses unrelated to the Businesses, nor did it permit the

---

[4] The Agreement lists Yasmin Masih as an "owner."  At trial, Plaintiff's counsel clarified that this was "a typo, a mistake." *See* Trial Tr. 169:20–25, 170:1.

Businesses to maintain more than one business bank account without prior approval from Itria. Pl.'s Ex. B; Trial Tr. 46–47.

The Agreement provided that the monies advanced were to be repaid to Itria as a percentage of the Businesses' merchant credit card receivables in the total amount of $256,000. Trial Tr. 39. At trial, Arora explained that the funds advanced under the Agreement were without interest and without a term because the Agreement provided for Itria to be repaid by virtue of a fixed percentage of the Businesses' credit card sales. *Id.* at 99–100.

On or about March 26, 2015, the Businesses defaulted under the terms of the Agreement. *Id.* at 39. Shortly thereafter, a representative of Itria visited the premises of Masih Gas, which had ceased operating at that point. *Id.* at 41.

On April 8, 2015, Itria commenced an action against Masih Gas, Kandiara Gas, the Debtor, Mana, and Yasmin in the New York State Supreme Court, Queens County, under Index No. 703417/2015 (the "State Court Action").

On December 22, 2015, Itria obtained a judgment (the "Judgment") in the State Court Action against the Debtor and the named defendants therein in the amount of $250,929.93. *See* Pl.'s Ex. C. Itria then began garnishing the Debtor's wages with his employer at the time, RSA Medical, in Chicago, Illinois, *see e.g.*, Trial Tr. 42, which led to the Debtor's bankruptcy filing.

Itria obtained the Masih Gas Bank Account statements (the "Masih Gas Bank Statements") for the period January 2015 through May 2015 through discovery in a different bankruptcy case pertaining to Mana. *Id.* at 44, 48, 72; Pl.'s Ex. D.

The Masih Gas Bank Statements reveal various expenditures from the Masih Gas Bank Account during January 2015 through March 2015 made on behalf of the Debtor and/or his family members, including his parents as well as his sister, Dimple Masih ("Dimple"), and his brother,

Mohit Masih ("<u>Mohit</u>") on account of personal credit card bills, utility bills, automobile loan payments, life insurance premiums, restaurant/dining charges, and gambling charges at casinos. Pl.'s Ex. D; Trial Tr. 52–68, 124–125.

The Masih Gas Bank Statements for January 2015, for instance, reflect payments for personal expenses including, but not limited to, the following:

1. January 23, 2015 payment made in the amount of $584.19 to Nissan for an Auto Loan for Dimple Masih;
2. January 26, 2015 payment made in the amount of $193.00 to Discovery for Mohit Masih;
3. January 26, 2015 payment made in the amount of $41.00 to Synchrony Bank for Yasmin Masih;
4. January 28, 2015 payment made in the amount of $1,305.25 to MetLife for Mana Masih;
5. January 28, 2015 payment made in the amount of $556.02 to Nissan for an Auto Loan for Dimple Masih;
6. January 29, 2015 payment made in the amount of $942.54 to Capital One for Yasmin Masih;
7. January 29, 2015 payment made in the amount of $855.30 to Capital One for Mana Masih.

*Id.*

The Masih Gas Bank Statements for February 2015, similarly reflect payments for personal expenses including, but not limited to, the following:

1. February 2, 2015 payment made in the amount of $1,398.15 to Capital One for Mana Masih;
2. February 2, 2015 payment made in the amount of $1,380.91 to Capital One for Yasmin Masih;
3. February 4, 2015 payment made in the amount of $3,150.67 to Capital One for Dimple Masih;
4. February 4, 2015 payment made in the amount of $3,150.67 to Capital One for Dimple Masih;
5. February 18, 2015 payment made in the amount of $7,000.00 to Mohegan Sun, Uncasville, CT;
6. February 18, 2015 payment made in the amount of $7,000.00 to Mohegan Sun, Uncasville, CT;
7. February 20, 2015 payment made in the amount of $7,280.00 to Caesars Atlantic City, Atlantic City, NJ;

8. February 23, 2015 payment made in the amount of $5,184.99 to Caesars Atlantic City, Atlantic City, NJ;

9. February 23, 2015 payment made in the amount of $7,280.00 to Caesars Atlantic City, Atlantic City, NJ;

10. February 27, 2015 payment made in the amount of $4,174.99 to Caesars Atlantic City, Atlantic City, NJ.

*Id.* The Masih Gas Bank Statements for February 2015, also reflect an online banking transfer made on February 4, 2015, in the amount of $34,500 to a checking account with an account number ending in 1168. *Id.*

Finally, the Masih Gas Bank Statements for March 2015, similarly reflect payments for personal expenses including, but not limited to, the following:

1. March 2, 2015 payment made in the amount of $7,280.00 to Caesars Atlantic City, Atlantic City, NJ;

2. March 2, 2015 payment made in the amount of $3,674.99 to Caesars Atlantic City, Atlantic City, NJ;

3. March 3, 2015 payment made in the amount of $1,500.00 to Mohegan Sun, Uncasville, CT;

4. March 4, 2015 payment made in the amount of $1,000.00 to Mohegan Sun, Uncasville, CT;

5. March 4, 2015 payment made in the amount of $7,000.00 to Mohegan Sun, Uncasville, CT;

6. March 4, 2015 payment made in the amount of $2,500.00 to Mohegan Sun, Uncasville, CT.

Pl.'s Ex. D; Trial Tr. 52–68.

The March 2015 Masih Gas Bank Statements also reflect the following cash withdrawals:

1. March 19, 2015 cash withdrawal in the amount of $9,500.00;
2. March 20, 2015 cash withdrawal in the amount of $9,800.00;
3. March 23, 2015 cash withdrawal in the amount of $9,700.00;
4. March 23, 2015 cash withdrawal in the amount of $9,800.00;
5. March 25, 2015 cash withdrawal in the amount of $9,800.00;
6. March 26, 2015 cash withdrawal in the amount of $4,600.00.

*Id.*

At trial, Arora testified that out of the $135,000 directly advanced to the Businesses, more than $120,000 was used for personal, non-business-related expenses for the Debtor or his family

members (the "Alleged Non-Business Expenditures"), Trial Tr. 74, including approximately $61,000 for gambling and approximately $60,000-65,000 in withdrawals that were placed in the accounts of the Debtor or his family members, with only approximately $20,000 repaid to Itria. *Id.* at 76; Pl.'s Post-Tr. Br. 3–4, ECF No. 22; Def.'s Post-Tr. Br. ¶ 33, ECF No. 23.

The Debtor admitted at trial that he used the Masih Gas Bank Account debit card for certain personal expenses, namely for "necessities" such as "fast food," and approximated that less than $500.00 of the Alleged Non-Business Expenditures could be attributed to him personally. Trial Tr. 125:19–25, 126:4–8. At trial, the Debtor testified that he had not authorized any of the other transactions, and that he was "embarrassed" to learn of the various personal expenditures made. *Id.* at 125:12–14, 126:18–20. The Debtor maintained throughout trial that he "did not recall" why there were transfers made from the Masih Gas Bank Account to his personal or joint accounts, *id.* at 137:12–21, that he "[could] not answer" why $34,500 was being transferred to his personal or joint accounts when he knew the business was struggling in February of 2015, *id.* at 139:22, 25, and that he "[did not] have an answer" for why Masih Gas had been paying for the Debtor's or his family's personal bills and expenses, *id.* at 115:1, 3.

The Debtor testified that his role as the owner of Masih Gas was "just to be overlooking the operations from time to time," but that the "day-to-day operations [were] mainly [conducted] by [his] father." *Id.* at 117:21–25, 118:1. The Debtor explained that "every few months or every so often [he] would come home, home as in Queens, New York, from out of state, and just kind of go over the profits, how much business the gas station is making." Trial Tr. 117:21–25, 118:9–15. The Debtor testified that he did not "pa[y] much attention or thought" to the Businesses, which he admitted "might have been a mistake on [his] part." *Id.* at 116:12, 17–18. The Debtor explained that this was because he was "focused on school at the time[, and] was going through a board exam

that [he] had to take and that was the primary thing on [his] mind at that point." *Id.* at 117:4–6.

When asked whether the Debtor was "just focused on school and not on [his] obligations as

president and sole shareholder," the Debtor testified that he "was attempting to balance both

. . . a failed attempt." *Id.* at 136:5–9.

## DISCUSSION

In this case, the Alleged Non-Business Expenditures are readily apparent from the

testimony and evidence adduced at trial and remain largely undisputed by the Debtor.  However,

Itria appears to conflate §§ 523 and 727 as grounds to deny the Debtor his discharge.  Itria alleges

that the Debtor provided financial information and made representations to Itria that were "false,

fraudulent, [and] bogus," in order to induce Itria to advance funds to the Businesses, Am. Compl.

¶ 5, and therefore, granting the Debtor a discharge would result in "manifest injustice to [Itria] and

reward the [Debtor]'s fraudulent actions." *Id.* ¶ 10.  While Itria's allegations appear to be grounded

in § 523, in the case at bar, Itria is not objecting to the dischargeability of its debt, but rather, seeks

to deny the Debtor's discharge in its entirety under § 727.[5]  Thus, the issue before the Court is

limited to whether Itria has established by a preponderance of the evidence that the Debtor's

discharge should be denied under § 727(a)(3) or (a)(4), and the Court finds that it has not.

"[A] central purpose of the [Bankruptcy] Code" is to allow the "honest but unfortunate

debtor" to "reorder [his] affairs, make peace with [his] creditors, and enjoy 'a new opportunity in

life with a clear field for future effort, unhampered by the pressure and discouragement of

preexisting debt.'" *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991) (quoting *Local Loan Co. v.

Hunt*, 292 U.S. 234, 244 (1934)).  "While § 523 simply bars discharge of specific debts incurred

---

[5] In fact, both parties by their respective counsel stipulated that Itria is not objecting to the dischargeability of its debt herein pursuant to § 523, and an Order to that effect was entered by the Court.

through fraud, § 727 is a blanket prohibition of a debtor's discharge, thereby protecting the debts owed to all creditors." *State Bank of India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1309 (2d Cir. 1996). As such, § 727 "impos[es] an extreme penalty for wrongdoing, [and thus] must be construed strictly against those who object to the debtor's discharge and liberally in favor of the bankrupt." *Jaroslawicz v. Steinberg (In re Steinberg)*, 2019 U.S. App. LEXIS 6794, *3 (2d Cir. Mar. 7, 2019) (quoting *In re Cacioli*, 463 F.3d 229, 234 (2d Cir. 2006)).

> Section 727(a)(3) provides that:

> The court shall grant the debtor a discharge, unless . . . the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.]

11 U.S.C. § 727(a)(3).

To state a *prima facie* claim under § 727(a)(3), the plaintiff must show: "(1) that the debtor failed to keep or preserve adequate records; and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions." *Pu v. Mitsopoulos (In re Mitsopoulos)*, 548 B.R. 620, 628–29 (Bankr. E.D.N.Y. 2016) (citations omitted). For § 727(a)(3) claims, "[t]he initial burden lies with the creditor to show that the debtor failed to keep and preserve any books or records from which the debtor's financial condition or business transactions might be ascertained." *Berger & Assocs. Attys., P.C. v. Kran (In re Kran)*, 760 F.3d 206, 210 (2d Cir. 2014) (quoting *In re Cacioli*, 463 F.3d at 235). Moreover, "the inquiry into the debtor's financial condition is limited to the span from a reasonable period of time before the bankruptcy filing through the pendency of the bankruptcy proceedings." *Kran*, 760 F.3d at 210. Intent to defraud is not an element of § 727(a)(3). *See, e.g.*, *Peterson v. Scott (In re Scott)*, 172 F.3d 959 (7th Cir. 1999); *Aspire Fed. Credit Union v. Robinson (In re Robinson)*, 595 B.R. 148,

158 (Bankr. S.D.N.Y. 2019).  If the creditor meets its initial burden to prove the inadequacy of the debtor's records, *Krohn v. Frommann (In re Frommann)*, 153 B.R. 113, 113 (Bankr. E.D.N.Y. 1993) (citing *In re Martin*, 554 F.2d 55, 58 (2d Cir. 1977)), the burden shifts to the debtor to show that the failure was justified, *In re Steinberg*, 2019 U.S. App. LEXIS 6794, *3 (citing *Cacioli*, 463 F.3d at 235).

As an initial matter, Itria has failed to demonstrate that the facts of this case fall within the scope of § 727(a)(3).  Here, Itria does not allege that the Debtor failed to preserve any books and records such that the Debtor's financial condition could not be ascertained postpetition.[6] *See* Am. Compl.  Rather, Itria alleges in the Amended Complaint that the Debtor misrepresented the financial condition of the Businesses at the time funding was sought from Itria. *See id.* Accordingly, § 727(a)(3) is inapplicable.

Even assuming, *arguendo*, that Itria sufficiently alleged a claim under § 727(a)(3), Itria failed to meet its initial burden to prove the inadequacy of the Debtor's records and, therefore, the burden did not shift to the Debtor.  In its post-trial brief, Itria contends that "[i]n the face of overwhelming documentary evidence," the Debtor expended Itria's funds for non-business purposes and that the Debtor was unable to offer any plausible explanation for the same. Pl.'s Post-Tr. Br. 8.  Clearly, Itria misunderstands the burden-shifting standard.  For instance, Itria argues that under *Desiderio v. Devani (In re Devani)*, 556 B.R. 37, 39 (Bankr. E.D.N.Y. 2016), the Debtor has an obligation to secure financial records if they are not in his possession, but that the Debtor did nothing to secure them. Pl.'s Post-Tr. Br. 9–10.  However, the facts of *Devani* are wholly inapposite to the case at bar.

---

[6] In his post-trial brief, the Debtor contends the same, asserting as follows: "Nowhere in the complaint and amended complaint is it alleged that Defendant committed a violation of any of the provisions of Sections 727(a)(3) or (a)(4) provisions [sic]." Def.'s Post-Tr. Br ¶ 40.

In *Devani*, the plaintiff had filed a motion for examination of the debtor pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, which was granted by an order authorizing the plaintiff to subpoena documents from the debtor, including bank statements, tax returns, and other financial records relating to the debtor's businesses. *Devani*, 556 B.R. at 40. The debtor in that case had failed to produce the majority of the requested documents in response to the subpoena. Thus, the court determined that the plaintiff had made a *prima facie* showing that the debtor failed to produce sufficient records and, as a result, the burden shifted to the debtor to show that such failure was justified. *Id.* at 42. The debtor asserted that he met his obligations because he produced all documents in his possession. The court held that if the debtor did not have financial records such as bank statements, he could have requested them from the banks, but did not. *Id.* at 43. Therefore, in finding that the debtor's failure was not justified, the court denied the debtor's discharge under § 727(a)(3).[7] *Id.* at 44–45.

Here, Itria failed to make a *prima facie* showing regarding the Debtor's failure to keep or preserve books and adequate records from which the Debtor's financial condition and material business transactions could be ascertained. To the contrary, Itria admits that it had "overwhelming documentary evidence" of how its funds were used. Pl.'s Post-Tr. Br. 8. Itria obtained the Masih Gas Bank Statements for the period January 2015 through May 2015, and relied on the same throughout trial. Trial Tr. 44, 48, 72; Pl.'s Ex. D. Inasmuch as Itria asserts that it did not have adequate records because the Debtor did not produce his personal bank statements during discovery relating to this adversary proceeding, Itria could have filed a motion to compel their production or subpoenaed them in connection with a Bankruptcy Rule 2004 examination. It did

---

[7] In *Devani*, the plaintiff also sought denial of the debtor's discharge under § 727(a)(4) and (a)(5). The court held that because there were ample grounds to deny discharge under § 727(a)(3), it need not address the claims under § 727(a)(4) and (a)(5). *Devani*, 556 B.R. at 45.

neither.[8]  Accordingly, to the extent that § 727(a)(3) was sufficiently pled, which the Court finds it was not, Itria failed to meet its burden to prove the inadequacy of the Debtor's financial records or other recorded information under § 727(a)(3) and, therefore, this claim for relief is denied.

Section 727(a)(4)(A) provides a basis for denying a discharge to a debtor who "knowingly and fraudulently, in or in connection with the case . . . made a false oath or account."  11 U.S.C. § 727(a)(4)(A).  It is well established that in order to prove an objection to discharge pursuant to this subsection, the objecting party must establish by a preponderance of the evidence that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew that the statement was false; (4) the debtor made the statement with intent to deceive; and (5) the statement related materially to the bankruptcy case. *Mitsopoulos*, 548 B.R. 620, 630 (citations omitted); *see also In re Boyer*, 328 Fed. App'x 711, 715 (2d Cir. 2009).  "A false oath sufficient to justify the denial of a discharge pursuant to § 727(a)(4)(A) includes (1) a false statement or omission in the debtor's schedules or (2) a false statement by the debtor at an examination during the course of the proceedings." *Frommann*, 153 B.R. at 118–19 (citations omitted).

Itria has failed to sufficiently allege a claim for relief under § 727(a)(4)(A).  Again, the Amended Complaint relies only on the Debtor's alleged prepetition misrepresentations regarding the financial condition of the Businesses at the time funding was sought from Itria.  This is clearly unrelated to and outside the scope of a § 727(a)(4)(A) cause of action.[9]  *See* Am. Compl. Accordingly, § 727(a)(4)(A) is inapposite.

At trial, Itria asserted that the Debtor falsely listed Queens, New York as his residence on his Petition, when he had been employed in Chicago, Illinois, at the time of the filing. Trial Tr.

---

[8] At the conclusion of trial, the Court asked whether the Plaintiff had filed a motion to compel production of documents in this case, and Plaintiff's counsel confirmed that he had not done so. Trial Tr. 170:4–6.
[9] *See also* n.6 *supra*.

7:11–15.  When asked whether the Debtor had resided in Queens, New York, at the time of his bankruptcy filing, the Debtor testified throughout trial that he had always considered his "permanent residence" to be in Queens, New York. *Id.* at 161:17–22, 162:16–18, 167:1–5, 20–22. While the Debtor incorrectly stated in his Petition that he had, "over the last 180 days before filing this petition[,] lived in this district for longer than in any other district," Pet., ECF No. 1, Main Case, Itria has not established by a preponderance of evidence that this statement was made with an intent to deceive and that the statement related materially to the bankruptcy case.

It is uncontroverted that the Debtor filed his required chapter 7 schedules, statement of financial affairs, and documents, in which he disclosed his 100% ownership interest in "Masih Gas Inc." and listed a general unsecured claim owed to Itria in the amount of $250,929.93. *See* Sch. A/B, E/F, ECF No. 7, Main Case.  Moreover, the Debtor credibly testified at trial that he was examined by the Chapter 7 Trustee at the § 341 meeting of creditors and answered all of the Trustee's questions. Trial Tr. 123:19–22, 147:12–18.  The Debtor testified that at the meeting of creditors, the Trustee requested certain financial documents and records, including bank statements, and the Debtor agreed to provide them to the Trustee. *Id.* at 123:23–25, 147:12–18, 149:24–25, 150:1–4.  The Debtor further testified that the requested documents were gathered by his father, who turned them over to his then-counsel Mr. Roman, *id.* at 104:14–20, 124:5–7, who the Debtor believes, in turn, provided them to the Trustee, *id.* at 124:11–13, 150:5–9.  Here, as in *Kran*, the Debtor provided sufficient financial records to permit the Trustee to administer the case and file a Report of No Distribution.[10] *Kran*, 760 F.3d at 210–11.  Accordingly, to the extent that

---

[10] The docket entry states, in relevant part, as follows: "Chapter 7 Trustee's Report of No Distribution: I, Richard J. McCord, having been appointed trustee of the estate of the above-named debtor(s), report that I have neither received any property nor paid any money on account of this estate; that I have made a diligent inquiry into the financial affairs of the debtor(s) and the location of the property belonging to the estate; and that there is no property available for distribution from the estate over and above that exempted by law. Pursuant to Fed R Bank P 5009, I hereby certify that the estate of the above-named debtor(s) has been fully administered. I request that I be discharged from any further duties as trustee." *See* Sept. 30 docket entry, Main Case.

§ 727(a)(4) was sufficiently pled, which the Court finds it was not, Itria failed to meet its burden to prove that the Debtor made a false oath or account in or in connection with this case and, therefore, this claim for relief is denied.

Without question, Itria demonstrated at trial that the Businesses did not utilize all the funds advanced in accordance with the Agreement and that the majority of the funds were used for personal expenses unrelated to the Businesses, including, e.g., for gambling at casinos, personal insurance policy premiums, personal credit card debts, utility bills, school tuition, fast food and restaurant bills, and cash withdrawals and transfers. While much of this spending was attributable toward specific family members, a very small sum was expended by the Debtor for himself.[11] The Debtor maintained throughout trial that his father, Mana, was the one in charge of the day-to-day operations of Masih Gas, as the Debtor had been pursuing his medical studies out of state, *see, e.g.*, Trial Tr. 155:15–20, that he did not personally authorize transfers from the Masih Gas Bank Account to his personal or joint account, *id.* at 142:14–16, and that no one had called him to inform

---

[11] During cross-examination by the Debtor's counsel, the Debtor testified as follows:

> Q: Counsel asked you about various transactions that showed that money in the business account, that came from Itria were used for personal use; is that correct?
> A: Yes.
> Q: There were charges for Dimple, your sister?
> A: Yes.
> Q: There were charges for your brother, Mohit?
> A: Yes.
> Q: We think your father went to the casinos?
> A: Yes.
>     . . .
> Q: And there were some charges that you used, personally; is that correct?
> A: Yes.
> Q: Can you tell the Court what was the most common [sic] you used that debit card for the business for?
> A: The most time it would have been the necessities, things like food, maybe it was fast food.
> Q: And there were several charges, $5, $10, et cetera; is that correct?
> A: Yes.
> Q: As you sit here today, can you estimate how much, from that money, from Itria, can be attributable to you personally?
> A: Based on these bank statements, the best guess or my best estimate rather would be in the hundreds, less than 500, I would say.

Trial Tr. 124:25, 125:1–9, 19–25, 126:1–8.

him that they were going to use the debit card associated with the Masih Gas Bank Account before doing so, *id.* at 125:12, 14.

Moreover, the Debtor testified at trial that he did not meet with anyone at Itria or with any attorney before signing the Agreement, and that he only spent "a few minutes" looking at the Agreement before signing it. *Id.* at 153:4–16. The Debtor further testified that it was "primarily [his] father" who asked him to sign the Agreement, and that he did so because his "personal[] intention was to support [his] father as he [had] supported [him] throughout [his] life." *Id.* at 152:24–25, 157:13–20. The Debtor explained that "at that time[, his] primary . . . focus was on [the] board exam and not necessarily [with Masih Gas]." *Id.* at 135:16–17. He further testified, "of course, you know, I was focused on the business as well, but at the time I was studying [for the board exam] . . . these requires [sic] a lot of time for that, so I tried not to pay as much attention to other distractions." Trial Tr. 135:17–22. At trial, the Debtor explained that he "attempt[ed] to balance both" studying and his obligations to Masih Gas, but that it was admittedly a "failed attempt." *Id.* at 136:5–9.

Based on the totality of the trial testimony, it is clear that the extent of the Debtor's involvement with the business operations was extremely minimal and akin to that of a passive investor; he was essentially the "owner" in name only. During the two months in question and the period of the Alleged Non-Business Expenditures, the Debtor was primarily out of state, and immersed in his medical studies. This was clearly a failing on the Debtor's part and not in keeping with the duties and responsibilities associated with being a president and sole shareholder of a corporation. Certainly, he had a duty to be, at the very minimum, cognizant of the operations and expenditures of the business. However, the issue before the Court is not whether Itria's debt should be excepted from discharge under § 523 based on the manner in which the Debtor performed or

failed to perform his corporate duties.  On the question that is properly before the Court—whether Itria has met its burden to establish by a preponderance of the evidence that the Debtor's discharge should be denied pursuant to § 727(a)(3) or (a)(4)—the Court finds and concludes that it has not.

## CONCLUSION

Accordingly, for the foregoing reasons, the relief sought in the Amended Complaint pursuant to § 727(a)(3) and (a)(4) is hereby denied and this adversary proceeding is dismissed.

**IT IS SO ORDERED.**

**Dated: March 31, 2019**
       **Brooklyn, New York**

**Nancy Hershey Lord**
**United States Bankruptcy Judge**